## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AMERIKAL PRODUCTS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 24 C 11292 |
| SIMON CAVE, JAMES MCMANUS, DARYL BURBY, SOLUTIONC LLC, TIMSONS, INC., STEPHEN RIPORTELLA, and IAN SHARP, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants Timsons, Inc., Stephen Riportella, and Ian Sharp's motion to dismiss Plaintiff Amerikal Products Corporation's complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

At a high level, Plaintiff Amerikal Products Corporation's ("Amerikal") complaint alleges that Defendants, including former Amerikal employees Simon Cave, James McManus, and Daryl Burby (together, the "Cave Defendants"), conspired with Defendant Timsons, Inc. ("Timsons-US"), its President, Defendant Riportella, and Director, Defendant Sharp (together, the "Timsons Defendants"), to misappropriate

Amerikal's trade secrets and confidential information, interfere with its customer agreements, and divert its business to competing entities. The following facts are taken from the complaint and are presumed true for the purposes of this motion. All reasonable inferences are drawn in Amerikal's favor.

Amerikal is an Illinois-based company that manufactures pressroom products aimed at reducing environmental harm and improving employee safety. Prior to 2014, Timsons-US's parent company, through one of its UK subsidiaries, Timsons, Ltd., manufactured certain unique offset book presses used throughout the world, including in the United States. In September 2014, Timsons-US's parent company stopped manufacturing the offset book presses and formed a new company, Timsons Engineering, Ltd. (UK), which continued to manufacture parts for the offset book presses still in service.

Timsons-US provided service and field support for the offset book presses manufactured by Timsons, Ltd. (UK). The Cave Defendants were employees of Timsons-US and provided services to Timsons-US's offset book press customers on an as needed and when needed basis.

In March 2016, Timsons-US stopped providing service and field support to its offset book press customers but continued to provide parts as produced by Timsons Engineering, Ltd. (UK). In May 2016, Amerikal agreed to take on the business of providing the service and field support for the Timsons Engineering, Ltd. (UK)'s manufactured offset book presses that Timsons-US previously provided. As part of this

process and new business, Amerikal agreed to employ the Cave Defendants, along with other former Timsons-US employees, to provide customers with uninterrupted service and field support. Cave ultimately became the Vice President of Engineering and McManus became the Vice President of Electrical Engineering.

In October 2023, Cave traveled to England and India to explore business opportunities with a potential machine builder in India who could build new book presses for TimsonsCPI, a joint venture between Timsons Engineering, Ltd. (UK) and another UK company that was formed in September 2021. Cave met with Sharp during this trip to discuss taking Amerikal's business. Cave returned from his trip with plans to leave Amerikal and take the customer base and business opportunities with him, moving them to Timsons-US.

After Cave's return, Timsons-US continued to communicate with customers and potential customers of Amerikal in an effort to have those customers execute purchase orders for service contracts with Amerikal. In January 2024, however, Cave informed Amerikal that the Cave Defendants would be resigning their positions and rejoining Timsons-US. This was a blow to Amerikal as it would leave the company unable to support ongoing contracts, including service contracts Cave entered into after October 2023 in his capacity as Amerikal's VP of Engineering.

In early February 2024, Cave, using his Amerikal email account, began communicating directly with Amerikal's customers and informing them of "an upcoming change to the service support currently provided by" Amerikal. Dkt. # 1,

3

¶ 56.  Specifically, Cave informed the Amerikal customers that as of April 1, 2024, "the current Amerikal service personnel including [Cave], will be transferring back to the Timsons organization."  *Id.* ¶ 58.  The emails were electronically signed by Cave in his capacity of "VP Engineering."  Essentially, Cave was attempting to convince customers to abandon their contracts with Amerikal and sign new ones with Timsons-US, effectively ending Amerikal's ability to continue in that line of business.  Cave was coordinating all efforts to interfere with the Amerikal customers and contracts with Sharp and Riportella.

Because the departure of the Cave Defendants left Amerikal without the personnel necessary to continue to service the contracts it had with its offset book press customers, Amerikal attempted to mitigate its losses and coordinate with the Cave Defendants and Timsons-US to transition the contracts from Amerikal to Timsons-US.

On February 21, 2024, Riportella emailed Amerikal customers and informed them that the "Amerikal Service Team [would be] rejoining Timsons Inc."  *Id.* ¶ 64.  Riportella stated that "Simon Cave is authorized on behalf of Timsons to help facilitate changing the past service agreements and the previously quoted projects from the Amerikal name to Timsons Inc dependent upon customer approval."  *Id.* ¶ 66.

To further minimize Amerikal's potential losses and liability exposure to the current and departing offset book press customers, Amerikal attempted to negotiate an agreement with Timsons-US to indemnify Amerikal for any losses or liability related to the service contracts for which Timsons-US would be taking over from Amerikal.

On March 18, 2024, however, Sharp emailed Amerikal and informed it that Timsons-US would not be providing Amerikal with an indemnity agreement and Timsons-US had "no intention to take any of the ongoing or future press related contracts." *Id.* ¶ 69.

On March 24, 2024, Cave informed Amerikal that he would be moving forward with the same plans with a company owned exclusively by Cave, SolutionC. On that same date, Cave, using his Amerikal email account, began communicating with Amerikal's Timsons-US offset book press customers, informing them that Timsons-US would no longer be involved in taking over the Amerikal business but that the Cave Defendants were still resigning their employment with Amerikal as of March 31, 2024. Cave informed the customers that the Cave Defendants still intended to "re-unify with Timsons" but in the interim, the Cave Defendants "in an effort to avoid disruption and continue providing support to the Timson client base from April 1st, we formed a new company: SolutionC LLC." *Id.* ¶ 72. Cave signed his email as "Ex-service manager of Timsons Inc and Amerikal Products Corp Owner of SolutionC LLC." *Id.* ¶ 74. Although the email stated that SolutionC was a new company, it had actually been formed by Cave in April 2020.

Amerikal alleges Defendants conspired with each other to steal Amerikal's trade secrets and knowingly stole and converted Amerikal's trade secrets in an effort to obtain the business opportunities for themselves and deprive Amerikal of such business opportunities throughout the United States and abroad. As a result of Defendants' improper and illegal actions, Amerikal is no longer able to provide any installation,

warranty, maintenance, or service to its customers owning Timsons Engineering, Ltd. (UK) offset book presses and has had, or will have, all of its services contracts related to that line of work terminated, with the work going to the Cave Defendants and resulting in Amerikal losing potentially over three million dollars in annual sales. In addition, Defendant McManus retained a computer and software owned by Amerikal and, using this information, the Cave Defendants conspired with one of Amerikal's customers/former customers, which delayed promised work to be performed and potentially opened Amerikal up to liability.

Based on the foregoing, Amerikal initiated this lawsuit. The seven-count complaint brings claims for misappropriation of trade secrets in violation of the Defend Trade Secret Act ("DTSA"), 18 U.S.C. § 1839(3), and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/2(d); civil RICO violations; civil conspiracy; breach of fiduciary duty; tortious interference with prospective economic advantage; and tortious interference with contract. The Timsons Defendants move to dismiss all claims against them under Rule 12(b)(6) for failure to state a claim.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529 (2011). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  This pleading standard does not necessarily require a complaint to contain detailed factual allegations.  *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

The Timsons Defendants move to dismiss all claims against them.  The Court will address each claim in turn.

### I.      Misappropriation of Trade Secrets

ITSA and DTSA prohibit the misappropriation of trade secrets under Illinois and federal law, respectively.  Because the statutes are substantially similar, courts can analyze separate claims brought under these laws together.  *See Petrochoice LLC v. Amherdt*, 2023 WL 2139207, at *7 (N.D. Ill. 2023).  A plaintiff bringing ITSA and DTSA claims must show "that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022) (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003)); *see also Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4034068, at *12 (N.D. Ill. 2021) (DTSA claim requires same elements).

### A. Trade Secrets

The Timsons Defendants first argue that Amerikal failed to identify any trade secrets. A trade secret consists of (1) business-related information, (2) that the owner has taken reasonable means to keep secret, and (3) that generates economic value through its secrecy. *See* 18 U.S.C. § 1839(3). At the motion to dismiss stage, trade secret "allegations [are] adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms." *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases); *see also AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920–21 (N.D. Ill. 2001) ("Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in the public disclosure of purported traded secrets.").

Here, Amerikal asserts that Defendants had access to product development, product design, pricing, marketing materials, marketing methods and processes, customer lists and information, prospective customer lists and information, information concerning finances, business and affairs of Amerikal, revenue numbers, and company structure. Other courts in this district have found similar descriptions of confidential information to be specific enough to survive a motion to dismiss. *See, e.g.*, *GE v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831–32 (N.D. Ill. 2019) (finding customer needs and preferences, pricing and margin information, information about confidential bids, confidential acquisition strategies and targets sufficient); *Inmar, Inc. v. Vargas*,

2018 WL 6716701, at *3–4 (N.D. Ill. 2018) (finding business development plans for existing clients, pricing and marketing strategies, lead sources, and research dossiers sufficiently specific to survive dismissal); *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, 2017 WL 3235682, at *3 (N.D. Ill. 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and detailed sales reports" sufficed at the pleading stage); *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill 2001) (finding trade secret description of marketing strategies, pricing data, and confidential business practices satisfied the notice pleading requirements).

Although some of Amerikal's customer and business information may have been known to the Timsons Defendants because Timsons-US previously supported the same clients, Amerikal's allegations go beyond the basic details. Amerikal alleges that it invested substantial time, money, and resources into, *inter alia*, producing marketing initiatives, creating business plans and marketing strategies, and compiling information regarding the unique needs and preferences of its customers. Amerikal further alleges that it invested time and resources in maintaining the confidentiality of this information. Accordingly, Amerikal's description of its trade secrets passes muster for now.

**B. Misappropriation**

Under DTSA, "misappropriation" is either: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired

by improper means" or "(B) disclosure or use of a trade secret of another without express or implied consent" under certain conditions. 18 U.S.C. § 1839(5). "[I]mproper means," in turn, is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6). ITSA defines "misappropriation," "improper means," and "trade secrets" very similarly, and for purposes of this dismissal motion, the slight differences are immaterial. *Compare* 765 ILCS 1065/2(a), (b), (d), *with* 18 U.S.C. §§ 1839(3), (5), (6).

The Timsons Defendants argue that the fact that Amerikal transitioned its customers to Timsons-US directly contradicts both facets of misappropriation because the Timsons Defendants did not use improper means to acquire such information and had consent to disclose or use such information. Amerikal, on the other hand, argues there are no allegations that it allowed or agreed to the Timsons Defendants using Amerikal's trade secret information in setting up the separate business, but the Timsons Defendants point out that there are also no allegations that they had any direct involvement in setting up that new business.

Additionally, there are no allegations that Defendants Sharp or Riportella engaged in any conduct involving the disclosure of trade secrets. Amerikal concedes it attempted to work with Timsons-US to transfer contracts from Amerikal to Timsons-US, thereby providing the Timsons Defendants with customer information. And Amerikal admits that Timsons-US did not end up taking over the contracts, because

10

Timsons-US refused to enter into an indemnity agreement with Amerikal. Amerikal alleges no involvement of the Timsons Defendants once indemnity negotiations fell through, which makes it difficult to conclude that the Timsons Defendants misappropriated or continue to misappropriate any of Amerikal's purported trade secrets. Accordingly, the Court dismisses Amerikal's DTSA and ITSA claims against the Timsons Defendants, without prejudice.

## II.    Federal Civil RICO

In Count II, Amerikal alleges that all Defendants violated the federal RICO statute, 18 U.S.C. § 1962(c), by conducting an enterprise through a pattern of racketeering activity. In Count III, Amerikal alleges that all Defendants are liable for conducting a RICO conspiracy in violation of 18 U.S.C. § 1962(d). The Timsons Defendants seek dismissal of both claims, contending that the facts alleged do not plausibly support the existence of either (1) an "enterprise" or (2) a "pattern" of racketeering activity, both of which are required elements for civil RICO liability. The Timsons Defendants further argue that because Amerikal's allegations fail to support an underlying RICO claim, the RICO conspiracy claim likewise fails.

Since its enactment, courts, including the Seventh Circuit, have repeatedly stressed the limited availability of civil RICO liability and confirmed that RICO does transform "garden-variety" state-court business disputes involving allegations of fraud into federal lawsuits for treble damages. *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 337 (7th Cir. 2019) (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022

(7th Cir. 1992); *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 522 (7th Cir. 1995) ("The murkiness of RICO's parameters coupled with its alluring remedies have led many plaintiffs to take garden variety business disputes and dress them up as elaborate racketeering schemes."). To establish a RICO violation, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies*, 943 F.3d at 336.

The Timsons Defendants first argue Amerikal failed to allege facts that would establish a single predicate criminal act, much less a pattern of racketeering activity. To satisfy the pattern of racketeering element of a civil RICO claim, a plaintiff must allege and prove at least two predicate acts that satisfy what has come to be called the "continuity plus relationship" test. *See Midwest Grinding*, 976 F.2d at 1022. This test screens out ordinary fraud disputes from the long-term organized criminal racketeering activity targeted by RICO. *Id.* Accordingly, the test requires that the alleged predicate acts be related to one another and that they pose a threat of continued criminal activity. *Id.*

As for the predicate act allegations, the Court found above that Amerikal failed to state a claim for misappropriation of trade secrets against the Timsons Defendants. Even leaving the adequacy of the predicate act allegations to one side, the Court agrees that, when it comes to the Timsons Defendants, Amerikal does not allege the type of long-term continuous misconduct sufficient to trigger RICO liability. The Seventh Circuit has identified two ways of satisfying the continuity portion of the continuity-

12

plus-relationship test. Amerikal must plead facts sufficient to establish either (1) "a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit" or (2) "an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future." *Midwest Grinding*, 976 F.2d at 1023; *Menzies*, 943 F.3d at 337. Labels aside, at the motion to dismiss stage, the determinative issue is whether Amerikal "adequately alleged that the challenged conduct occurred and went on long enough and with enough of a relationship with itself to constitute a pattern." *Menzies*, 943 F.3d at 337.

The RICO allegations against Sharp and Riportella are largely conclusory; the complaint is light on specific actions taken by them. The specific allegations against Sharp are that he allegedly met with Cave in London to discuss taking Amerikal's business, and later emailed Amerikal stating that Timsons would not provide Amerikal with an indemnity agreement. There are no allegations that Sharp was involved in any misconduct once Cave moved forward with SolutionC. Riportella is alleged to have emailed Amerikal customers on February 21, 2024, informing them that the "Amerikal Service Team [would be] rejoining Timsons Inc," and that "Simon Cave is authorized on behalf of Timsons to help facilitate changing the past service agreements and the previously quoted projects from the Amerikal name to Timsons Inc dependent upon customer approval." Dkt. # 1, ¶¶ 64, 66. Again, there are no allegations that Riportella was involved in any misconduct once Cave moved forward with SolutionC. Other than these allegations, Sharp and Riportella are lumped in with the Cave Defendants through

generalized allegations of misconduct. Amerikal has failed to state a RICO claim against the Timsons Defendants. The claim is dismissed without prejudice.

The Timson's Defendants are also correct that Amerikal's failure to plead a viable civil RICO claim likewise dooms its RICO conspiracy claim. Having failed to allege a plausible RICO enterprise or pattern of RICO activity, Amerikal's RICO conspiracy gambit also fails. *See United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d at 849, 856–57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), [Plaintiffs] cannot state a claim for conspiracy under Section 1962(d) based on those same facts."). This claim is dismissed too, without prejudice.

### III. Tortious Interference and Civil Conspiracy

In Counts V through VII, Amerikal brings state law claims for tortious interference with contract, tortious interference with prospective economic advantage, and civil conspiracy. The Timsons Defendants argue that Amerikal's tortious interference and civil conspiracy claims are preempted by ITSA, and that even if they are not preempted, Amerikal's complaint fails to state these claims.

#### A. Preemption

Section 8 of ITSA states that, "[e]xcept as provided in subsection (b), [ITSA] is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). "ITSA preempts claims for misappropriation of confidential information

14

(whether a trade secret or not); it does not preempt claims that do not hinge on whether the information at issue is confidential." *Westrock Co. & Victory Packaging, LP v. Dillon*, 2021 WL 6064038, at *18 (N.D. Ill. 2021) (citing *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005)). In deciding whether ITSA preempts a claim, the Court asks whether it "would stand regardless of whether trade secrets were at issue." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 835 (N.D. Ill. 2019).

Amerikal argues that its state law claims do not *only* rely on the misappropriation of trade secrets for support, pointing to its allegations that Defendants planned to take over all of Amerikal's "used press installations, press component upgrades, future new press warranty and service work related to the offset book presses from Amerikal for Timsons" and wrongfully communicated with Amerikal's customers over a period of months "in an effort to have all of Amerikal's offset book press customers cancel their contracts with Amerikal and sign new agreements with Timsons, effectively ending Amerikal's ability to continue in that line of business." The Court agrees that the complaint purports to allege tortious acts independent of any misappropriation of trade secrets. Thus, Amerikal's tortious interference claims are not preempted.

### B. Tortious Interference with Contract

For its tortious interference with a contract claim, Amerikal must plead (1) the existence of a valid and enforceable contract between Amerikal and another; (2) the Timsons Defendants' awareness of the contractual relationship between Amerikal and another; (3) the Timsons Defendants' intentional and unjustifiable inducement of a

breach of the contract; (4) a breach of contract by the other caused by the Timsons Defendants' wrongful acts; and (5) damage to Amerikal. *Chadha v. N. Park Elem. Sch. Ass'n*, 2018 IL App (1st) 171958, ¶ 60 (quoting *Cress v. Recreation Servs., Inc.*, 341 Ill. App. 3d 149, 175 (2003)).

The Timsons Defendants argue Amerikal's tortious interference with contract claim fails because there are no allegations to support its claim that the Timsons Defendants unjustifiably induced customers to breach their contracts; the complaint does not allege any breach actually occurred. Rather, the Timsons Defendants say, the complaint states that contracts were transitioned *by* Amerikal to Timsons and later to SolutionC. Amerikal argues in response that the Timsons Defendants' position "simply ignores the fact that Plaintiff's attempts to mitigate its damages was never consummated as the Parties could not reach an agreement regarding, among other things, the Defendants' indemnification of Amerikal." Dkt. # 31, at 18.

However, even drawing all reasonable inferences in Amerikal's favor, Amerikal fails to state a claim against the Timsons Defendants. "For a tortious interference claim to survive a motion to dismiss, the complaint must allege specific conduct in which the defendants engaged." *Medscript Pharmacy, LLC v. My Script, LLC*, 77 F. Supp. 3d 788, 796 (N.D. Ill. 2014) (citing *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 970 (N.D. Ill. 2007). The specific conduct alleged regarding Riportella is his letter to Amerikal's customers advising them of the upcoming change to Timsons-US and stating Cave would be assisting. This letter appears to have been sent after Amerikal

began to coordinate with Defendants to transition the contracts. Additionally, there are no allegations that Sharp induced any customers to breach their Amerikal contracts. The only specific action Amerikal attributes to Sharp is his March 18, 2024 email to Amerikal (not its customers) in which he informed Amerikal that Timsons-US would not be providing Amerikal with an indemnity agreement and that Timsons-US had "no intention to take any of the ongoing or future press related contracts." Dkt. # 69. The Timson Defendants' motion to dismiss is granted as to Amerikal's tortious interference with contract claim. The claim is dismissed without prejudice.

### C. Tortious Interference with Prospective Economic Advantage

For its tortious interference with prospective economic advantage claim, Amerikal must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the Timsons Defendants' knowledge of the expectancy, (3) an intentional and unjustified interference by the Timsons Defendants that induced or caused a breach or termination of the expectancy, and (4) damage to Amerikal resulting from the Timsons Defendants' interference." *Grako v. Bill Walsh Chevrolet-Cadillac, Inc.*, 2023 IL App (3d) 220324, ¶ 23 (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 300–01 (2001)).

The Timsons Defendants argue there was no existence of a business relationship at the time the alleged tortious occurred, because as alleged in the Complaint, Amerikal agreed to transition its service contracts to Timsons. Amerikal's tortious interference with prospective economic advantage claim fails for the same reason Amerikal's

17

tortious interference with contract claim fails. The claim is dismissed without prejudice.

### D. Civil Conspiracy

Lastly, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means." *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, ¶ 19. To state a civil conspiracy claim, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement. *Id.* ¶ 20. The essence of a conspiracy claim is not the agreement but rather the tortious acts performed in furtherance of the agreement. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994). "It necessarily follows, therefore, that a conspiracy is not an independent tort and, where a plaintiff fails to state an independent cause of action underlying the conspiracy allegations, the claim for conspiracy also fails." *Tri-Plex Tech Servs. v. Jon-Don, LLC*, 2024 IL 129183, ¶ 40.

The Court concludes that Amerikal has alleged independent tortious conduct by at least one of the Cave Defendants, and the allegations of the complaint permit a reasonable inference that the Cave Defendants could not have committed such tortious acts without the agreement of the Timsons Defendants. The Cave Defendants planned to leave Amerikal for Timsons-US and take Amerikal's customers and business with them. This suggests the Timsons Defendants had knowledge of and agreed with the

way in which the Cave Defendants intended to interfere with Amerikal's business. The motion to dismiss is denied as to Amerikal's civil conspiracy claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Timsons Defendants' motion to dismiss [23] is granted in part and denied in part. Counts I through III, V, and VI against the Timsons Defendants are dismissed without prejudice. The motion is denied as to Count VII. Amerikal may file an amended complaint by 7/29/2025, should it choose to do so.

It is so ordered.

Charles P. Kocoras
United States District Judge

Dated: 7/8/2025